UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Gregory M. Crow and Brenda
Crow,

                Plaintiffs,

    vs.                                  ORDER

Wal-Mart Stores, Inc.,

               Defendant.        Civ. No. 04-3877 (JNE/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, pursuant to the provisions of Title 28 U.S.C. §636(b)(1)(A), upon the Motion of the Plaintiffs to Exclude the Expert Opinions of Donald Anderson ("Anderson"). A telephonic Hearing on the Motion was conducted on September 8, 2005, at which time, the Plaintiffs appeared by Andrew R. Peterson, Esq., and the Defendant appeared by Jerome D. Feriancek, Esq.

For reasons which follow, the Plaintiff's Motion to Exclude Anderson's Expert Opinions is granted.

II. <u>Factual Background</u>

On August 16, 2002, at approximately 10:00 o'clock p.m., Gregory Crow ("Crow") was driving his vehicle, along with his wife, Brenda, and their son, Christopher, when he struck a pedestrian sign, which was located in the parking lot of the Wal-Mart Superstore in Bemidji, Minnesota. At the time of the accident, it was dark, and raining, and the Plaintiffs allege that the sign was not visible. Allegedly, Crow sustained injuries, as a result of the accident, and he has commenced this action in order to recover damages for those injuries. Crow's wife, Brenda, is also a Plaintiff to the action, who seeks to recover damages resulting from a loss of consortium.

As part of its expert disclosures, the Defendant revealed that it will proffer the testimony of Anderson, who is a certified accident reconstructionist. Anderson presently works in private practice as a consulting engineer, in the design of industrial and recreational vehicles. He is a 1960 graduate of General Motors Institute, and he obtained his Bachelor of Science degree upon his completion of a Fifth Year Thesis Program in 1961. <u>Affidavit of Donald Anderson ("Anderson Aff.")</u>, at Exh. 1. From 1963 until the present, Anderson has performed accident reconstruction, research, and engineering analysis, on over 3,000 motor vehicle accidents. <u>Id.</u> Anderson has also authored a number of articles on accident reconstruction.

In the present litigation, Anderson has expressed the following opinions, concerning the Plaintiffs' collision, to an engineering certainty:

> 1.     [T]he 1995 Dodge 3500 pickup was involved in a collision prior to the subject 16 August 2002 incident; information regarding the earlier collision has been requested but not received; germane information lacking at this juncture then includes airbag status, adequacy of steering and suspension repair and steering alignment, as well as maintenance issues of vehicle control leading to the subject incident[;]

> 2.     [T]he 1995 Dodge 3500 Pickup was not preserved as evidence in its damaged state, i.e., damaged parts were removed and partially replaced; the evidence was spoliated[;]

> 3.     [T]he subject sign post was a fixed object[;]

> 4.     [S]tandard data for the pickup, operator and passengers' weight was 6,849 lbs.[;]

> 5.     [T]he pickup was steered left into collision with the sign post during hours of darkness, rain and gusting winds; "raining buckets* *" "standing water" [Wilwant][;][1]

---

[1]James L. Wilwant was the police officer charged with investigating the Plaintiffs' collision on the night of the incident.

5.[2]    [D]eposition testimony [Crow 07/085] and responding Bemidji police officer [Wilwant] confirm steering input immediately prior to striking the sign post[;]

6.    [D]amage pattern, location and extent of the pickup, signpost, its foundation and surrounding pavement fracture all document a collision speed greater than the five (5) mph speed alleged by the operator, Gregory Crow[;]

7.    [O]ccupant kinematic response to the collision, including the windshield headstrike (Christopher Crow, age 19 male) was consistent with an impact speed of approximately 22 mph[;]

8.    [T]he pick up was operated in a range of 17 to 22 mph with steering input to the left into collision with fixed signpost; no evidence of braking exists * * *[;]

9.    [T]he impact was eccentric (non-central), incomplete and partially elastic[;]

10.    [T]he combined physical damage to pavement, post and pickup document an approach angle to collision of approximately 341 degrees; the kinematic response to the front outboard passenger serves to corroborate this angle[;]

11.    [T]he pickup rotated through approximately seventy degrees about the signpost at impact[;]

12.    [T]he impulse center of the impact was approximately 39.0 inches outboard to the left of the vehicle centerline and

---

[2]While it appears that Anderson has misnumbered his opinions, for ease of reference, we refer to the numerical paragraphs as they appear in his Report.

- 4 -

approximately 8.5 inches aft of the front axle design location[;]

13.    [A]s a ratio, background luminance of new bituminous asphalt and foreground luminance of the signage and pavement markings was .818; the signage and pavement markings fall within the 'region of seeing' of the motoring public (see Appendi[x)][;]

14.    [T]he angle of approach of the pickup to the sign post exposed approximately 2.9 square feet of bright burnished sign metal to an oncoming driver; area of the exposed sign metal plus the traffic yellow paint of the post was approximately 3.5 square feet[;]

15.    [F]urther, reported gusting winds presented a flickering image of the exposed bright burnished rear surface of the sign metal to an oncoming driver[;]

16.    [B]ased on my experience, training, education and continuing research, it is apparent the pickup operator was inattentive; operation was defective[;]

17.    [B]ased on the combined damage, location, pattern and extent it is apparent the pickup speed was unreasonable for conditions; operation was defective.

Expert Report of Donald Anderson ("Anderson Report"), at pp. 1-2, Affidavit of Andrew R. Peterson ("Peterson Aff.") at Exh. G; Anderson Aff. at Exh. 2.

Anderson also made a number of "engineering insights," including the following:

*    *    *

2.    [B]oth the federal and state rules address protection of sign posts: "Standard: sign posts, foundations, and

- 5 -

mountings shall be so constructed as to hold signs in a proper and permanent position, and to resist swaying in the wind or displacement by vandalism." [Section 2A.21 and Section 2A.22][;]

*    *    *

4.    [T]he sign post was sited within pavement marking -- a polygon bounded by sides of northerly 214 inches, easterly 18 inches, southeasterly 252 inches and westerly 144 inches, width of the diagonal striping within the polygon was 4-1/2 inches * * *[;]

5.    [D]amage to the sign post included displacement of its foundation and fracture of its surrounding bituminous asphalt pavement; the fracture line roughly corresponds to a center of a circle, the chord of which is approximately 86 inches long with a mid-ordinate measurement of approximately 22 inches; the fracture extends approximately 18 inches to the southeast and northerly 67-1/2 inches; the concrete is fractured with spalling to the southwest; the signpost was out of plumb approximately six degrees[;]

6.    Energy equivalent speed assessment of vehicle damaged parts will be completed on receipt of the parts designated at inspection 19 May 2005[;]

Id. at pp. 3-4.

Purportedly, Anderson arrived at his opinions using the following "engineering protocol:"

(a)    [E]xamine discovery material available to all parties[;]

- 6 -

(b)     [I]nspect the vehicle in a partially disassembled (spoliated evidence) state[;]

(c)     [E]stablish the direction of principal force resulting in damage to the vehicle[;]

(d)     [I]dentify other vehicle damage not consistent with striking the sign post (the vehicle had been in an earlier collision 114 days prior)[;]

(e)     [V]erified the vehicle was involved in a front end collision (Minnesota Case #21140060) 24 April 2002 – 114 days prior to the date of the subject incident on 16 August 2002 as well as a third collision 05 May 1998 (Minnesota Case #81250066)[;]

(f)     [I]nspect the subject parking lot and pedestrian sign[;]

(g)     [E]stablish the direction of principal force to deflect the sign post from its foundation in the global system of the parking lot[;]

(h)     [E]stablish the direction (travel path) of the vehicle immediately prior to its striking the sign post[;]

(i)     [E]stablish the minimum (lower boundary) speed resulting in the observed damage[;]

(j)     [I]dentify the headlamp model and type of vehicle (HB-4, 9004)[;]

(k)     [C]ompare the motoring public visual cone (MNDOT) with the isoilluminance diagram representing light truck low beams (the two correspond and encompass the

- 7 -

area of the signpost from the vehicle's travel path; the standard for minimum intensity of the vehicle's low beam headlamp at 2D to 15L is 700 ed)[;]

(l)    [E]stablish photometric measure of contrast from standard data and/or file data between bitumen asphalt and traffic yellow paint[;]

(m)    [E]stablish a comparison of size (as visual acuity) of the sign post to that of a fiftieth percentile male pedestrian (3.5 to 7.2 square feet respectively); the pedestrian wearing denims presents a luminance of five to eight percent, while the sign post with new traffic yellow paint presents a luminance of approximately sixty percent[;]

(n)    [U]tilize field tests at GM in the early 1990s reported:

> "Using a darkly clad adult, one test result showed that a driver with good vision could see the pedestrian at 290 feet (88.4 m) with low beams at 540 feet (164.6m) with high beams[.]
>
> On the other hand, a driver with poor vision could only see this pedestrian at 210 feet (64 m) with low beams and at 390 feet (1118.9 m) with high beams* * *" [Joseph M. Callahan, Sight at Night, Chilton's Automotive Industries, October 1991, pg. 30][.]

(o)    [R]eview [Minnesota Statutes Section] 169.60, which states:

> "(a)    There shall be an uppermost distribution of light, or composite

> > beam, so aimed and of such intensity as to reveal persons and vehicles at a distance of at least 350 ahead for all conditions of loading[.]"
>
> > and
>
> > "(b)   There shall be a lowermost distribution of light, or composite beam, so aimed and of significant intensity to reveal persons at a distance of at least 100 feet ahead * * *[.]"

(p)   [E]stablish the signpost was conspicuous and visible to the motoring public under marginal illumination as well as the higher illumination intensity of the vehicle headlamps[;]

(q)   [E]quate Blackwell's target acquisition time if zero-point two (0.2) seconds to visual search of motoring public[;]

(r)   [E]stablish the operator perception reaction time available in the range of five mph (alleged by the Plaintiff) and 22 mph (indicated by the physical evidence)[;]

*   *   *

(u)   [C]alculate speed at impact, the left front tire was deflated, inboard and rearward into contact with the rim; the rim was deformed and showed through the sidewall, as documented by the patterns of physical evidence; the calculus for speed of the vehicle immediately prior to striking the sign post relied on Firestone specifications for the LT235/85R16 tire, as well as 49 CFR 571.109.S4.2.2.3.1(c); carefully substituting values for tread

- 9 -

width, carcass height collapse, the area of contact and specified load ranges (upper and lower boundaries)[;]

(v)     [C]ontinue to request data; while damage repair estimates have been requested documenting the collisions reported at depositions, only one has been received (North Country Collision dated 10/28/2002); attention is directed to Page Two of Three of this:

> "Pull & Square Frame 5.0 *frame*"

> five mph collisions do not deform or otherwise [w]reck frames, particularly Dodge Ram 3500 Series heavy-duty frame[;]

(w)     [A]ttention is directed to 49 CFR 571.219.S. 5 and the metric of 48 kph (30 mph) speed and 6 mm (0.24 inches) deformation (not to exceed limit penetration of windshield); the windshield of this vehicle was fractured with occupant kinematic response of the far side passenger (Christopher Crow).

Anderson Aff. at ¶4.[3]

The Appendices to Anderson's Report also contain a bibliography of the sources,

which he is said to have relied upon to support his opinions.

_____

[3]Anderson's explanation of his "engineering protocol," in his Supplemental Affidavit, appears to be substantially similar, although slightly more detailed than the explanation of his "methodology" in his original Report. Compare Anderson Aff., at Exh. 4, with Anderson Report, at p. 4.

- 10 -

The Plaintiffs now challenge the admissibility of Anderson's opinions, under the

standards set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579

(1993), and Rule 702, Federal Rules of Evidence.

III.  Discussion

A.    Standard of Review.  "The admissibility of expert testimony is governed,

in large measure, by Rule 702, Federal Rules of Evidence, which provides as follows:

> If scientific, technical, or other specialized knowledge will
> assist the trier of fact to understand the evidence or to
> determine a fact in issue, a witness qualified as an expert by
> knowledge, skill, experience, training, or education, may
> testify thereto in the form of an opinion or otherwise, if (1)
> the testimony is based upon sufficient facts or data, (2) the
> testimony is the product of reliable principles and methods,
> and (3) the witness has applied the principles and methods
> reliably to the facts of the case."

Teska v. Potlatch Corp., 184 F. Supp.2d 913, 918 (D. Minn. 2002), citing Rule 702,
Federal Rules of Evidence (2001); see also, Medalen v. Tiger Drylac U.S.A., Inc., 269
F. Supp.2d 1118, 1127 (D. Minn. 2003).[4]

---

[4]Rule 703, Federal Rules of Evidence, also imposes the following restrictions
on the provision of expert opinion evidence:

> The facts or data in the particular case upon which an
> expert bases an opinion or inference may be those
> perceived by or made known to the expert at or before the
> hearing.  If of a type reasonably relied upon by experts in
> the particular field in forming opinions or inferences upon

- 11 -

"As the Supreme Court has explained, 'Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the "assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline."'" Engleson v. Little Falls Area Chamber of Commerce, 210 F.R.D. 667, 670 (D. Minn. 2002), quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 148 (1999), quoting, in turn, Daubert v. Merrell Dow Pharmaceuticals, Inc., supra at 592.  "When evaluating the admissibility of expert testimony, a Court must look to both the relevance, and the reliability, of the proffered testimony."  Id., citing Lauzon v. Senco Products, Inc., 270 F.3d 681, 686 (8th Cir. 2001); see also, Daubert v. Merrell Dow Pharm., Inc., supra at 591-93; Bonner v. ISP Technologies, Inc., 259 F.3d 924, 929 (8th Cir. 2001); Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1082 (8th Cir. 1999).

"'When it comes to admission of expert testimony under the Federal Rules of Evidence, a trial judge has a gatekeeping responsibility to "ensur[e] that an expert's testimony rests on a reliable foundation and is relevant to the task at hand."'"  Id., quoting Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc., 254 F.3d

---

the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

- 12 -

706, 714-15 (8ᵗʰ Cir.2001), quoting, in turn, <u>Kumho Tire Co., Ltd. v. Carmichael</u>, supra at 141. "'Both the Eighth Circuit Court of Appeals and the Supreme Court have made clear that a person, although qualified as an expert in one area of expertise, may be precluded from offering opinions beyond that expertise, or that are not founded on a reliable methodology.'" <u>Teska v. Potlatch Corp.</u>, supra at 919, quoting <u>Smith v. Rasmussen</u>, 57 F. Supp.2d 736, 766 (N.D. Iowa 1999), citing <u>Kumho Tire Co., Ltd. v. Carmichael</u>, supra at 141.

"Ultimately, 'it is the responsibility of the trial judge to determine whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in the case.'" <u>Id.</u>, quoting <u>Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.</u>, supra at 715, citing <u>Kumho Tire Co., Ltd. v. Carmichael</u>, supra at 156. "'Once initial expert qualifications and usefulness to the jury are established, however, a district court must continue to perform its gatekeeping role by ensuring that the actual testimony does not exceed the scope of the expert's expertise, which if not done can render expert testimony unreliable under Rule 702, Kumho Tire, and related precedents.'" <u>Id.</u>, quoting <u>Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.</u>, supra at 715.

"'[B]efore accepting the testimony and opinion of an expert witness, the Trial Court is charged with the "gatekeeper" function of determining whether the opinion is based upon sound, reliable theory, or whether it constitutes rank speculation.'" Id., quoting Kemp v. Tyson Seafood Group, Inc., 2000 WL 1062105 at *2 (D. Minn., July 19, 2000), citing Kumho Tire Co. v. Carmichael, supra at 141, 119 S.Ct. 1167, and Daubert v. Merrell Dow Pharmaceuticals, Inc., supra at 589-90. "'Expert testimony that is speculative is not competent proof and contributes "nothing to a legally sufficient evidentiary basis."'" Id., quoting Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1057 (8th Cir. 2000), quoting, in turn, Weisgram v. Marley Co., 528 U.S. 440, 454 (2000).

"As the Court in Kumho made clear, the Trial Court's gatekeeping function is to be employed for all expert testimony." Id., citing Kumho Tire Co. v. Carmichael, supra at 141, 119 S.Ct. 1167 ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."); see United States v. Nichols, 411 F.3d 824 n. 8 (8th Cir. 2005); see also, Rule 702, Federal Rules of Evidence, Advisory Committee Notes to 2000 Amendments ("Consistently with Kumho, the Rule as amended provides that all

- 14 -

types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable and helpful.").

"In the final analysis, '[i]n order to be helpful to the trier of fact, the witness must be qualified as an expert, the expert must have a reasonable factual basis for their testimony, the testimony must be based on reliable methods, and the testimony must be relevant to the facts at issue.'"    Engleson v. Little Falls Area Chamber of Commerce, supra at 671,  quoting Kemp v. Tyson Seafood Group, Inc., supra at *2. As the Supreme Court, in General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997), succinctly observed:

> Trained experts commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply to great an analytical gap between the data and the opinion proffered.

With these precepts in mind, we turn to Anderson's proffered expert testimony.

B.    Legal Analysis.    The Plaintiffs have specifically challenged the admissibility of Anderson's opinions pertaining to:  1) the attentiveness of Crow; 2) the reasonableness of Crow's speed of travel; 3) the speed and angle of the vehicle at the time of the collision; 4) the effective function of the vehicle; and 5) the visibility of

the sign at the time of impact, upon the assertion that the challenged opinions are neither reliable, nor relevant to the pending action.[5]

"The proponent of expert testimony must prove its admissibility by a preponderance of the evidence." Lauzon v. Senco Products, Inc., supra at 686, citing Daubert v. Merrell Dow Pharmaceuticals, Inc., supra at 592. "To show that the expert testimony is relevant, [the proffering party] must show that the reasoning or methodology in question is applied properly to the facts in issue." Lord v. Nissan Motor Co., Ltd., 2004 WL 2905323 at *5 (D. Minn., December 13, 2004), citing Daubert v. Merrell Dow Pharmaceuticals, Inc., supra at 593; see Medalen v. Tiger Drylac U.S.A., Inc., supra at 1135 ("[F]or [expert] evidence to be relevant * * * there must be a 'valid scientific connection' to the pertinent inquiry as a precondition to admissibility."), quoting Group Health Plan, Inc. v. Phillip Morris, Inc., 188 F.

_____

[5]While the Plaintiffs' written submissions urge that Anderson is not qualified to testify as an expert concerning the conspicuity of the sign, that argument seems to have been abandoned at the Hearing. In any event, given Anderson's professional affiliation, and participation with the Illuminating Engineering Society of North America, and his participation in lectures on conspicuity, we are satisfied that Anderson is qualified as an expert concerning the visibility of the sign. See Affidavit of Donald Anderson at ¶3; Affidavit of Andrew R. Peterson at Exh. G. Furthermore, considering Anderson's extensive training and experience in accident reconstruction, we are satisfied that Anderson is qualified to testify on matters pertaining to accident reconstruction.

Supp.2d 1122, 1130 (D. Minn. 2002), quoting, in turn, Daubert v. Merrell Dow Pharmaceuticals, Inc., supra at 591-92.  Moreover, under the law of our Circuit, it has been held an abuse of discretion to admit expert testimony that "rel[ies] on inferences that have absolutely no record support."  Weisgram v. Marley Co., 169 F.3d 514, 519 (8th Cir. 1999), aff'd, 528 U.S. 440 (2000).

Here, the Defendant maintains that Anderson's opinions were derived from his use of the "accepted engineering method."  The Defendant has described that process as involving the following sequential steps:  1) "define the problem;" 2) "accumulate facts;" 3) "make necessary assumptions;" 4) "select an appropriate and established scientific, mathematical or engineering principle;" 5) "solve the problem;" 6) "consider alternate solutions; and" 7) "verify the results."  Defendant's Memorandum of Law in Opposition to the Plaintiffs' Motion to Exclude Expert Testimony and For Summary Judgment ("Defendant's Mem."), at p. 8, Docket No. 114.

The Defendant's representations, and the information provided in Anderson's disclosures, suggest that Anderson's opinions are predicated on information gathered during his examination the site of the accident, including damage to the sign post and

surrounding asphalt;[6] his examination of the Plaintiffs' vehicle, which was at least in a partially altered state from that which it was in at the time immediately following the accident;[7] his review of the discovery materials presented in this case; and his review of a variety of other materials, such as pertinent statutes, and regulations, concerning illumination and traffic signs.

However, Anderson's disclosures fail to establish a sufficient, objective connection, between the information gathered during his investigation, and the opinions he proffers. Notably, while Anderson has detailed the conduct of his investigation, he has not identified any engineering formulae, or principles, which, if applied to the facts that were gathered, would support his conclusions. Accordingly, he has failed to provide a basis upon which a Juror, or the Plaintiffs for that matter, could evaluate his opinions as being anything other than his own conjecture.

Specifically, Anderson has opined that the Plaintiffs' vehicle was traveling at a rate of speed ranging from seventeen (17) miles per hour to twenty-two (22) miles per

---

[6]Based on the Record presented, we are unable to determine the exact date of Anderson's inspection of the accident site. Nonetheless, the parties' representations suggest that a significant amount of time passed between the accident and Anderson's inspection.

[7]According to his Report, Anderson's inspection of the Plaintiffs vehicle occurred on May 15, 2005, or almost three years after the accident in question.

hour.  According to his Report, Anderson arrived at this opinion after examining the

damage to the sign post, the asphalt surrounding the sign post, and the damage to the

Plaintiff's vehicle, including a crack in the vehicle's windshield which resulted when

Christopher Crow struck his head during the collision.    However, nothing in

Anderson's Report, or in his Supplemental Affidavit, detail how the observed damage

to the pavement, signpost, and vehicle, would yield a conclusion that the Plaintiffs'

vehicle was traveling at a speed of twenty-two (22) miles per hour, rather than ten (10),

or even five (5) miles per hour.[8]  Accordingly, Anderson's conclusory statements, that

the physical evidence establishes that the Plaintiff's vehicle was traveling at twenty-two

(22) miler per hour, appear to be premised on nothing more than his own ipse dixit –

i.e., I have said it, therefore it must be true.    In compliance with our "gatekeeping

---

[8]For example, Anderson did not have the benefit of skid marks, and pragmatic
tests, which would have provided a basis upon which to draw opinions of speed.  No
tests were conducted on similar signs, secured in similar ways, so as to measure the
the speed of the Plaintiffs' vehicle on impact.  We understand Anderson to infer that,
because the frame of the Plaintiffs' vehicle was out of alignment, that the speed at the
time of impact must have been greater than five (5) miles per hour, but he cites no
published, or peer reviewed studies, to correlate the misalignment of a motor vehicle
frame, with the speed of the vehicle before collision.  We do not doubt that a Jury,
which considers all of the evidence admissible at Trial, could reasonably infer the
speed of the vehicle before the collision, but that inference is not assisted by
Anderson's rank suspicions.

- 19 -

function," we cannot admit such speculative testimony. See <u>J.B. Hunt Transport, Inc.</u> <u>v. General Motors Corp.</u>, 243 F.3d 441, 444 (8th Cir. 2001) ("Expert testimony that is speculative is not competent proof and contributes nothing to a legally sufficient evidentiary basis."), quoting <u>Concord Boat Corp v. Brunswick Corp.</u>, 207 F.3d 1039, 1057 (8th Cir. 2000), cert. denied 531 U.S. 979 (2000).

The Defendant has similarly failed to establish the reliability of Anderson's opinion that the approach angle to the collision was 341 degrees, or that the collision caused the vehicle to rotate 70 degrees around the sign. Specifically, while it appears that Anderson's opinion is predicated on his examination of the Plaintiffs' vehicle, as well as the damage to the pavement and sign post, he does not identify any engineering principle which, if applied to the information gathered, would support his stated opinion. He presents the evaluator of his opinions with no comparable cracking in pavement, following a collision at a known speed, so as to assess the cracking observed in this instance -- assuming that the cracking was all attributable to the accident in question, and not to other causes which Anderson has no means of positively excluding.

Similarly, Anderson's opinion, that the operation of the vehicle was defective, also appears to be based entirely on his own <u>ipse</u> <u>dixit</u>. While Anderson has examined

the Plaintiffs' vehicle, he admits that the vehicle was in a "spoliated" state, as some parts had been removed and partially replaced. He further admitted that "germane information," such as the adequacy of prior steering and suspension repairs, was lacking at the time of his inspection. Moreover, we were unable to locate anything in Anderson's Report, or in his Supplemental Affidavit, to explain the inferential leap that Anderson makes from his inspection of the Plaintiffs' vehicle, to his opinion that the vehicle was defective.[9] See J.B. Hunt Transport, Inc. v. General Motors Corp., supra at 443 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."), citing General Electric Co. v. Joiner, supra at 146.

Anderson's opinion, concerning the visibility of the sign post to the motoring public on the night in question, seems to be predicated, on his examination of the sign post, as well as his inspection of an 'at scene' photograph, as augmented by his

---

[9]The Defendant contends that we should be more indulgent in accepting Anderson's conclusions, as his report was not intended to be a full recitation of his opinions, and the bases upon which the opinions were drawn. We disagree. The very basis for the expert disclosure Rule, as well as the Daubert regimen, was to allow a fair appraisal of all of the opinions of a proposed expert before the expert is allowed to testify. To suggest, as the Defendant does here, that a parsing of an expert's anticipated testimony is premature until after the expert testifies at Trial, reveals a misunderstanding of Daubert and its progeny.

conclusion that the Plaintiff's vehicle was heading 241 degrees to the post -- whatever that should mean --  and that the angle, between the Plaintiff's vehicle and the sign's rear surface, was approximately 20.6 degrees.   Anderson Report, at Appendix A. However, much like Anderson's opinions concerning the speed and angle of the Plaintiff's vehicle, neither his Report, nor his Supplemental Affidavit, articulate how those determinations were made so as to demonstrate either their relevance or reliability.   To meaningfully assist the Jury, something more is required than the expert's bare opinion.

The Court, in Daubert, recognized that one of the factors for determining the relevance and reliability of an expert's testimony is "whether the theory or technique 'can be (and has been) tested' * * *."  Lauzon v. Senco Products, Inc., supra at 686-87, quoting Peitzmeier v. Hennessy Industries, Inc., 97 F.3d 293, 297 (8th Cir. 1996), citing, in turn, Daubert v. Merrell Dow Pharmaceuticals, Inc., supra at 593-94.  While the Defendant relies on Anderson's purported use of the "engineering method," his expert disclosures to date fail to establish how that method was employed, as Anderson has not identified the "established scientific, mathematical or engineering principle[s]" which, if applied to the accumulated facts, would support his opinions. Given this deficiency, it is not possible to responsibly test the acceptability of

Anderson's opinions.  In the absence of any means to evaluate Anderson's opinions, his proffered testimony is of no use to the Jury.[10]

The Defendant has urged that the references, which are contained in Anderson's Appendices, disclose the scientific connection between the information that he has gathered, and the opinions that he has expressed.  In those Appendices -- and specifically in Appendix B -- Anderson has cited to a number of sources, including some scholarly journals.  Some of the citations also contain specific references to page numbers.  However, Anderson does not identify the proposition for which those authorities are being cited and, while the possibility exists that support for Anderson's opinions could be found in the sources identified, we cannot make that assumption based on the materials provided.  The strictures of <u>Daubert</u> would be easily eluded if the party proffering expert opinion could simply cite to treatises, without addressing the substance, and propriety of relying upon such texts.  Accordingly, the Appendices

---

[10]We make plain, here, that we do not question Anderson's credentials, nor do we presume that the conclusions he reaches are beyond the boundaries of scientific or technical proof.  The fatal deficiency, here, is that Anderson provides the opinions, but they are left untethered to any showing of proof.  While we accept opinions in our daily lives because they are expressed by persons with knowledge -- such a television commentators -- those opinions are not the grist of legal proof and, absent compliance with <u>Daubert</u>, such opinions would not be admissible in a Court of law.

-- which do nothing to illuminate the acceptability of Anderson's opinions -- fail to establish the relevance or reliability of the conclusions he reaches.[11]

Since we have found Anderson's proffered testimony concerning the Plaintiffs' rate of speed to be unreliable, he has no legitimate basis to complain about the reasonableness of that speed, and his opinion to that effect is also stricken. The same holds true for Anderson's proffered testimony concerning Crow's attentiveness at the

---

[11]The deficiencies that have been identified in Anderson's expert disclosures, which render his proffered testimony inadmissible under Rule 702, Federal Rules of Evidence, also fail to satisfy the requirements of Rule 26(a)(2)(B), Federal Rules of Civil Procedure, which requires that an expert's Report "contain a complete statement of all opinions to be expressed **and the basis and reasons therefor** * * *" [emphasis added], and our Pretrial Scheduling Order, which contained an identical directive. See Docket No. 8, at p. 3.

The Defendant has now informally requested that Anderson be permitted an opportunity to cure the deficiencies in his expert disclosures. However, the deadline for expert disclosures was June 15, 2005, and, shortly thereafter, counsel for the Plaintiff drew those deficiencies to the attention of the Defendant. See Affidavit of Andrew R. Peterson, Exhibit I. Subsequently, Anderson provided an Affidavit to the Defendant, dated August 30, 2005, but the Affidavit did not cure the fatal shortcomings of Anderson's report. Argument on the Defendant's Motion for Summary Judgment has been heard, and the case will be "Ready for Trial," if Summary Judgment is not granted. Under the circumstances, a further delay to allow the Defendant another opportunity to remedy Anderson's opinions is unwarranted.

time of the accident, as Anderson has not identified anything other than the asserted

visibility of the sign as the basis for that conclusion.[12]

---

[12]Nothing contained in Anderson's disclosures establishes his expertise concerning the reasonableness of a motorist's rate of speed, or the attentiveness of a driver. Even with a proper showing of expertise, we would exclude such opinion testimony, under the law of this Circuit, since it would not be helpful to the Jury. In Kostelecky v. NL Acme Tool/NL Industries, Inc., 837 F.2d 828, 830 (8th Cir. 1988), the Court concluded that it was error to admit an accident report into evidence, which purported to determine the cause of a motor vehicle accident -- an ultimate issue of fact. In so concluding, the Court reasoned as follows:

> Under the Federal Rules of Evidence, opinion testimony is not inadmissible solely because it embraces an ultimate issue to be decided by the trier of fact. Fed.R.Evid. 704(a). This does not, however, mean that all opinion testimony as to ultimate issues is admissible. In the case of a witness not testifying as an expert, the opinion testimony must be "(a) rationally based on the perception of the witness and (b) be helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Fed.R. Evid. 701. In the case of an expert witness, the opinion must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702.
>
> Under either rule, evidence that merely tells the jury what result to reach is not sufficiently helpful to the trier of fact to be admissible. See Hughes v. American Telephone and Telegraph Co., 812 F.2d 409, 411-12 (8th Cir. 1987). Often such testimony is labeled a "legal conclusion." * * * The

- 25 -

Therefore, since we find that the Defendant has failed to establish the admissibility of the Anderson's proffered testimony, that the proffered testimony is irrelevant and unreliable, and that such testimony would not be helpful to the Jury, we grant the Plaintiff's Motion to Exclude Anderson's Expert Opinions at Trial.

NOW, THEREFORE, It is --

ORDERED:

That the Plaintiffs' Motion to Exclude the Expert Opinions of Donald Anderson [Docket No. 99] is GRANTED.

BY THE COURT:

Dated:  October 11, 2005                    s/Raymond L. Erickson

                                            Raymond L. Erickson
                                            CHIEF U.S. MAGISTRATE JUDGE

---

case was tried on a theory of negligence.  Legal causation was very much in dispute.  Therefore, in the context of this case, the opinion as to causation served to do nothing more than tell the jury which result it should reach.

See also, Harris v. Pacific Floor Mach. Mfg. Co., 856 F.2d 64, 67-68 (8th Cir. 1988).